IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DEBRA E. McDANIEL,

        Plaintiff,

vs.                                 Civil No. 12-cv-1000-DRH-CJP

CAROLYN W. COLVIN,
Acting Commissioner of Social
Security,

        Defendant.[1]

## MEMORANDUM and ORDER

HERNDON, Chief Judge:

In accordance with 42 U.S.C. § 405(g), plaintiff Debra E. McDaniel seeks judicial review of the final agency decision denying her Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for benefits in June, 2009, alleging disability beginning on January 1, 2000. (Tr. 11). After holding an evidentiary hearing, ALJ Joseph L. Heimann denied the application for benefits in a decision dated May 25, 2011. (Tr. 11-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been

---

[1] Carolyn W. Colvin was named Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following points:

1.   The ALJ erred in determining plaintiff's RFC by failing to include all limitations supported by the evidence and by improperly analyzing the medical records.

2.   The ALJ failed to properly evaluate plaintiff's credibility.

### Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520. Under this procedure, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. McDaniel was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   In reviewing for substantial evidence, the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Heimann followed the five-step analytical framework described above. He determined that Ms. McDaniel had only been sporadically employed in the past and that none of her work rose to the level of substantial gainful activity.   He found

that she had severe impairments of cervical spine narrowing and spondylosis, mild degenerative disc disease of the lumbosacral spine, old fractures of the clavicles, minimal obstructive lung disease, mild coronary artery disease, personality disorder not otherwise specified, and a history of alcohol and substance abuse.   He determined that her substance abuse was in remission and did not adversely affect her overall mental status or functioning.   He further determined that her impairments did not meet or equal a listed impairment.

The ALJ found that Ms. McDaniel's allegations about her impairments and limitations were not credible.   He determined that she had the residual functional capacity (RFC) to perform work at the light exertional level, with some physical and mental limitations.   She had no past relevant work.   Based on the testimony of a vocational expert, the ALJ found that plaintiff was not disabled because she was able to do jobs which exist in significant numbers in the local and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

The first version of the administrative record, filed at Doc. 18, was incomplete.   The Commissioner filed a corrected version at Doc. 30.   The Court cites to the corrected version herein.

**1.     Agency Forms**

Plaintiff was born in 1962, and was almost 38 years old on the alleged onset date of January 1, 2000.   (Tr. 154).

Plaintiff filed three prior applications for SSI.   (Tr. 14).   In the most recent prior application, filed in March, 2007, plaintiff alleged disability beginning on January 1, 2000.   (Tr. 153).   That application was denied on August 1, 2007, and plaintiff did not appeal.   (Tr. 77-81, 165).

In a report filed in support of the current application, plaintiff said she became unable to work as of January 1, 2000, because of emphysema, heart problems, broken collar bones, problems with her neck, shoulders and back, and depression.   (Tr. 169).

Agency records indicate that plaintiff had total lifetime earnings of $3,056.36 through 2010.   She earned about $545 in 2000.   She earned nothing in 2001, and about $580 in 2002.   She had no earnings from 2003 through 2010.   (Tr. 145).

Ms. McDaniel filed an Activities of Daily Living report in August, 2009, stating that she did very little throughout the day.   She said she was in pain all of the time, and some days she did not get out of bed.   (Tr. 187).   She had no health insurance and she had not been able to find a doctor who would treat her because she could not pay.   She said that pain management at Memorial Hospital would not treat her because she could not pay.   (Tr. 194).

**2.     Evidentiary Hearing**

Ms. McDaniel was represented by an attorney at the evidentiary hearing on March 16, 2011.  (Tr. 27).

The ALJ asked plaintiff why she chose the date of January 1, 2000, as her alleged date of onset.  She said she did not know.  (Tr. 33-34).  The ALJ questioned her about her sporadic work history, and she testified that she had babies in 1981, 1987 and 1988.  She received welfare benefits while her children were minors.  (Tr. 34).  After she lost her benefits, she depended on an abusive, alcoholic boyfriend for financial support.  (Tr. 36).

Ms. McDaniel testified that the main problems keeping her from working were depression and pain in her neck and shoulders.  She could not afford pain medication or medicine for her depression.  (Tr. 35-36).  She was able to get some medical treatment after a car accident in October, 2010, only because the insurance on the car she was riding in covered it.  (Tr. 36-37).  (Tr. 45).

Plaintiff had not taken any medication since she was hospitalized for gallbladder removal in February, 2011.  Ms. McDaniel testified that, because she had no health insurance and no money, the only way she could get pain medication was to go to the emergency room and then try to borrow money to fill the prescription given to her there.  (Tr. 37-38).

Ms. McDaniel testified that her neck hurt constantly.  She was able to move her neck a full range side to side, but moving her neck a lot caused her to have migraine headaches.  Both of her collarbones had been broken in the past and had not healed correctly.  She was able to reach with her arms, but repetitive motions

caused pain from her wrists to her shoulders and into her neck.   (Tr. 38-40).   She was short of breath all the time because of emphysema.   She had tried to quit smoking, but was unable to do so and still smoked a pack a day.   She was unable to afford any medicine for her breathing.   She bummed cigarettes from her children.   She had not seen a doctor for her breathing in years because she had no insurance and could not afford the medicine anyway.   (Tr. 41-42).

Plaintiff saw a doctor for depression, and he gave her samples of Lexapro. She could not afford to fill the prescriptions he gave her.   (Tr. 50).   She had been hospitalized several times after suicide attempts.   (Tr. 52-53).

A vocational expert (VE) also testified.   The ALJ asked her to assume a person of plaintiff's age and work experience who could do work at the light exertional level, limited to no climbing of ladders, ropes or scaffolds, no exposure to vibration, and limited to simple routine tasks in a low stress environment with only occasional decision making and occasional changes in the work setting.   The VE testified that this person would be able to do jobs which exist in the local economy, such as hostess, cafeteria helper and light housekeeping.   (Tr. 62-63).   If a restriction to only occasional interaction with the public, coworkers and supervisors were added, the hostess job would be eliminated.   (Tr. 63).   If she were limited to only frequent reaching (as opposed to constant), she could still perform the cafeteria helper and housekeeping jobs according to the *Dictionary of Occupational Titles* descriptions of those jobs.   However, in the VE's experience, as those jobs are actually performed, a limitation to frequent reaching would

eliminate those jobs as well.   (Tr. 64-66).

### 3.   Medical Treatment

Ms. McDaniel's prior application was denied in August, 2007.   That denial "stands as the final decision on her disability through the date of the decision. . . ." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).   The Court thus focuses on medical evidence close to and after that date, while recognizing that earlier evidence may be considered to the extent that it is relevant to plaintiff's condition during the time period in issue.   See, *Groves v. Apfel*, 148 F.3d 809, 810-811(7th Cir. 1998).

There are no treatment records for the period of October, 2006, to May 18, 2008.   (Tr. 14).

On May 18, 2008, Ms. McDaniel was admitted through the emergency room to St. Elizabeth's Hospital in Belleville, Illinois, for depression and suicidal/homicidal ideation.   She reported that, two or three weeks earlier, she had passed out after drinking and woken up with bruising.   She believed she may have been raped.   Alcohol was "a major problem" for her.   A drug screen was positive for marijuana.   She had impaired concentration, feelings of hopelessness and helplessness, and lack of appetite.   She had received psychiatric care in the past, but not for the last three years.   She had four DUI convictions in the past and had been in prison for driving on a revoked license.   The Axis I diagnoses were recurrent major depressive disorder, alcohol dependence, alcohol withdrawal, and marijuana abuse.   The Axis II diagnosis was personality disorder, not otherwise specified.   She was treated with therapy and antidepressant medication.   She was

discharged on May 22, 2008, in improved condition and was to follow up with Dr. Loynd at the Windsor Center.   (Tr. 402-405).

In July, 2008, plaintiff was seen in the emergency room at Belleville Memorial Hospital.   She had been assaulted by her boyfriend, who had hit her with an axe handle.   She was intoxicated. (Tr. 463-468).   A CT scan of the head was negative.   (Tr. 475).   A CT scan of the abdomen/pelvis showed no acute pathology.   (Tr. 477).   A CT of the cervical spine showed marked degenerative changes from C3 through C7, but no fractures.   (Tr. 478).

Plaintiff was seen by a nurse practitioner at State Street Health Center in East St. Louis, Illinois, three times in 2008.   In June, 2008, she was seen for "pain management."   The NP noted a history of broken clavicles and a bulging disc.   Her clavicles were "deformed."   She had a full range of motion of the neck and back. The NP noted emphysema and prescribed an inhaler.   She also prescribed Flexeril and Percocet.   (Tr. 424).   In July, plaintiff came in for a refill of her prescriptions. No abnormal findings were noted on exam.   She complained of pain in her neck and shoulder.   (Tr. 423).   In September, the physical exam was again normal. Plaintiff refused to go to pain management, and the NP explained that she was "starting to taper off Percocet/Flexeril."   Plaintiff was given some medicine samples and prescriptions.   (Tr. 422).

She returned to the emergency room in November, 2008, complaining of neck and shoulder pain.   She had run out of her medications.   There was a note that she was on Lexapro.   A history of depression was noted.   (Tr. 433-434).

Exam showed muscle spasm and decreased range of motion in the neck.   Her low back exam was normal with a painless range of motion.   (Tr. 435).   An x-ray of the cervical spine showed advanced multilevel degenerative disc disease, stable since the prior x-ray done in July, 2008.   (Tr. 442).

Ms. McDaniel was seen in the emergency room at St. Elizabeth's Hospital in December, 2008, following an altercation with her boyfriend.   The doctor's impression was domestic dispute/emotional distress and alcohol intoxication. (Tr. 397-399).

Following the assault with the axe handle, plaintiff was referred by the emergency room doctor to Dr. Heffner for a neurosurgical consultation.   Dr. Heffner saw her in February, 2009.   She reported that she had recently been beaten again.   She told him she was unable to afford to see a family doctor or to get physical therapy.   X-rays and CT scan showed diffuse degenerative changes throughout the cervical spine with no sign of disc herniation, fracture or nerve compromise.   Dr. Heffner diagnosed cervical spondylosis and neck pain, and advised her that she did not need any surgery.   He recommended that she seek treatment such as anti-inflammatory medication and physical therapy from a primary care physician, but she said she could not afford it.   (Tr. 497-498).

The only other documented medical treatment in 2009 consisted of two emergency room visits.   Plaintiff sought emergency room treatment for neck and shoulder pain and headache in March, 2009.   On exam, her neck was not tender and had a painless range of motion.   The diagnosis was cervical strain.   She was

advised to apply heat and was prescribed Darvocet and Flexeril.   (Tr. 444-450).
In June, she went to the emergency room for a foot injury.   (Tr. 457).

In September, 2009, Dr. Adrian Feinerman performed a consultative
physical examination.   Plaintiff said she had shoulder pain since 1989, and neck
pain since a car accident fifteen years earlier.   She also complained of pain in her
elbows, wrists and hands.   She had been told she had heart disease.   She had a
history of alcoholism.   She was seeing a psychiatrist for depression and had been
prescribed Lexapro, but she was out of it.   The physical examination was
essentially normal.   There was no abnormality of any extremity and no limitation
of motion of any joint.   She complained of bilateral shoulder pain after active range
of motion.   Grip strength was strong and equal.   There was no anatomic
deformity of the cervical or lumbar spine, and range of motion was full.   Muscle
strength was normal throughout, and there was no muscle spasm or atrophy.   Fine
and gross manipulation were normal.   (Tr. 507-516).

Harry J. Deppe, Ph.D., performed a psychological examination on the same
day.   Ms. McDaniel noted a long history of excessive alcohol use, and use of
marijuana and crack cocaine in the past.   She was under the care of Dr. Loynd, a
psychiatrist, but was not taking any psychotropic medication.   The exam was
basically normal.   Her mood was normal and she had a full range of affect.   She
was fully oriented.   She had no trouble staying focused and her memory was good.
She had good simple reasoning skills.   Dr. Deppe concluded that she had fair
ability to maintain attention sufficient to perform simple, repetitive tasks, and fair

ability to understand and follow simple instructions.   (Tr. 490-495).

The transcript is missing some of Dr. Loynd's records.   The earliest record is dated January 13, 2010, although he states he last saw plaintiff two months earlier.   She was doing well on her medications, with no side effects.   Her mood was good and she denied depressive symptoms.   She was continued on Remeron, Lexapro and Ambien.   The doctor gave her samples of Lexapro.   (Tr. 546-548).

Plaintiff saw Dr. Loynd again in June, 2010.   She reported that she had run out of medicine and was having a little more stress and anxiety.   She denied depressive symptoms such as crying spells or suicidal thoughts.   Dr. Loynd again prescribed Remeron, Lexapro and Ambien, and gave her samples of Lexapro.   He encouraged plaintiff to "call back to re-order the Patient Assistance medications as soon as possible."[3]   (Tr. 549-550).

In July, 2010, plaintiff was taken to the emergency room following a suicide attempt.   She had been drinking heavily, had an argument with her boyfriend, and took an overdose of Ambien.   She also admitted using marijuana.   She was discharged to an inpatient psychiatric unit in another hospital after two days.   (Tr. 591-593).   There are no records of an inpatient stay in the transcript.

Ms. McDaniel went to the emergency room in October, 2010, complaining of chronic neck and back pain.   She was out of pain medication and psychiatric medication.   She said she was unable to afford regular visits to a doctor.   She was

---

[3] "Patient assistance programs are run by pharmaceutical companies to provide free medications to people who cannot afford to buy their medicine."  http://www.rxassist.org/, accessed on May 27, 2014.

diagnosed with chronic pain and given prescriptions for Lexapro, Vicodin and Ibuprofen. (Tr. 563-570). Two days later, she returned with neck, shoulder and back pain following a car accident. She was diagnosed with a shoulder contusion and strain of the cervical and lumbosacral spine. She was discharged to home with prescriptions for pain medications. (Tr. 571-579).

Plaintiff returned to the emergency room on November 9, 2010, for continuing neck and back pain. She had not filled her prescriptions because they were too expensive. She was given pain medication and discharged. (Tr. 580-584).

Ms. McDaniel was seen at a Southern Illinois Healthcare Foundation facility in November, 2010, and January 25, 2011, for pain in her shoulders, neck and back. (Tr. 601 -603).

Ms. McDaniel went to the emergency room with chest pain in February, 2011. A cardiac work-up was negative. She was diagnosed with acute cholecystitis, and her gallbladder was removed. (Tr. 553-558).

In March, 2011, Southern Illinois Healthcare Foundation requested authorization from the "third party insurance" (presumably, the insurance carrier for the vehicle involved in the October, 2010, accident) for a lumbar MRI. (Tr. 599). This was done on April 11, 2011, and showed degenerative disc disease with bulging disc at L5-S1. There was no thecal sac narrowing and minimal bilateral neural foraminal narrowing. (Tr. 606-607).

**5.    Opinions of Treating Doctors**

There are no reports from treating doctors in the transcript.

### Analysis

The Court first turns to plaintiff's challenge to the ALJ's credibility determination.

Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.  The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.  "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."  *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).  It is not enough just to

describe the plaintiff's testimony; the ALJ must analyze the evidence.   *Ibid.*   See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir., 2009)(The ALJ "must justify the credibility finding with specific reasons supported by the record.")

Of particular relevance here, an ALJ may not conclude that a claimant is exaggerating her pain and limitations based on lack of medical treatment or failure to take medication without taking into account the claimant's inability to afford treatment.   *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013), citing SSR 96-7p, 1996 WL 374186, at *7-8.

The Commissioner concedes that ALJ Heimann specifically discussed two factors in assessing plaintiff's credibility, i.e., her sparse work record and the fact that she was not taking any medication at the time of the hearing.   See, Doc. 32, pp. 10-13.

ALJ Heimann found it significant that much of plaintiff's treatment was emergency room care, and remarked that she never really had "what can be called regular medical attention or treatment."   He recognized that she testified that she could not afford medication or regular medical care, but concluded that this was not true because she recently had gallbladder surgery.   In addition, he stated that there was "no evidence that she has ever been refused medical treatment because of inability to pay."   Tr. 17.   The ALJ's conclusions are not supported by the record and are the result of faulty reasoning.

First, plaintiff's gallbladder surgery came about after she presented to the emergency room with apparent chest pain.   She was admitted for a cardiac

work-up, and it was determined that her gallbladder was the cause of her pain. The ALJ equated plaintiff's ability to obtain hospital treatment in an emergency situation with ability to obtain ongoing care from a doctor and to obtain prescription medications from a pharmacy.   This was error.   Hospitals face legal requirements to treat uninsured patients in certain circumstances.   See, *Beller v. Health and Hospital Corporation*, 703 F.3d 388, 390 (7th Cir. 2012), discussing the Emergency Medical Treatment and Active Labor Act.   Individual doctors and pharmacies are not similarly required to provide care and medications to patients who cannot pay.

Secondly, the ALJ overlooked evidence in concluding that there was no evidence that Ms. McDaniel had ever been refused treatment because of inability to pay.   Plaintiff stated in an agency form that she had not been able to find a doctor who would treat her without payment and that pain management at Memorial Hospital would not treat her because she could not pay.   See, Tr. 194.   There are repeated references in emergency rooms records to the fact that she had no insurance and had not been able to afford to fill prescriptions.

This case is remarkably similar to *Pierce v. Colvin*, 739 F.3d 1046, 1050-1051 (7th Cir. 2014), in which the credibility determination was held to be erroneous where the ALJ relied heavily on the absence of objective support for plaintiff's claim while ignoring her lack of health insurance and misstated some of the evidence.   See also, *Morgan v. Astrue*, 393 Fed. Appx. 371, 375 (7th Cir. 2010), holding that a credibility determination based on "unsound reasoning" is

erroneous.

The erroneous credibility determination requires remand. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce,* 739 F.3d at 1051. Here, plaintiff's testimony is not incredible on its face, and it is clear that the decision depended in large part on plaintiff's credibility.

It is not necessary to address plaintiff's other point, but, as in *Pierce*, the determination of plaintiff's RFC will require "a fresh look" after reconsideration of Ms. McDaniel's credibility. *Ibid.* In addition, the Court notes that the current record does not contain all of Dr. Loynd's records.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. McDaniel is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Debra E. McDaniel's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   May 30, 2014**

Digitally signed by
David R. Herndon
Date: 2014.05.30
10:53:46 -05'00'

**Chief Judge**
**United States District Court**

2